# United States Court of Appeals for the Federal Circuit

---

**GARCO CONSTRUCTION, INC.,**
*Appellant*

**v.**

**SECRETARY OF THE ARMY,**
*Appellee*

---

2016-1936

---

Appeal from the Armed Services Board of Contract Appeals in Nos. 57796, 57888, Administrative Judge Craig S. Clarke.

---

Decided: May 9, 2017

---

STEVEN D. MEACHAM, Peel Brimley LLP, Henderson, NV, argued for appellant.

KENNETH DINTZER, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for appellee. Also represented by BENJAMIN C. MIZER, ROBERT E. KIRSCHMAN, JR., SCOTT D. AUSTIN.

---

Before WALLACH, HUGHES, and STOLL, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* STOLL.

Dissenting opinion filed by *Circuit Judge* WALLACH.

STOLL, *Circuit Judge*.

Garco Construction, Inc., appeals a decision of the Armed Services Board of Contract Appeals denying Garco's damages claim arising out of its contract with the U.S. Army Corps of Engineers to build housing units on Malmstrom Air Force Base. Garco argues that a change in the base access policy prevented its subcontractor from bringing many of its workers onto the base, requiring its subcontractor to hire and train more workers, and forcing it to incur additional costs. Garco also alleges a constructive acceleration of the contract. Because we conclude that there was no change to the base access policy, we reject Garco's arguments and affirm the Board's decision.

## BACKGROUND

Malmstrom Air Force Base in Great Falls, Montana, is the largest missile complex in the Western Hemisphere. The base houses the Minuteman III intercontinental ballistic missiles, which carry a nuclear payload. The U.S. Army Corps of Engineers put out for bid Contract No. W912DW-06-C-0019 to build housing units on the base, and on August 3, 2006, awarded the contract to Garco Construction, Inc. Garco subcontracted some of the work to James Talcott Construction ("JTC") in September 2006. JTC had performed considerable work on the base in the past.

The Corps of Engineers–Garco contract contained two provisions especially pertinent here: (1) it incorporated Federal Acquisition Regulation ("FAR") § 52.222-3, which provides that contractors are permitted to employ ex-felons; and (2) it required contractors to at all times adhere to the base access policy. The base access policy, in place since at least 2005, indicated:

> A 911 Dispatcher will run the employees['] name[s] through the National Criminal Information Center [("NCIC")] system for a *wants and warrants check*. Unfavorable results will be scrutinized and eligibility will be determined on a case-by-case basis by the 341 SFG/CC.

J.A. 51 (emphasis added).

After work on the contract began, JTC began experiencing difficulty bringing its crew onto the base. JTC bussed many of its workers to the base from a local prison's pre-release facility, and those workers in particular experienced difficulty accessing the base. Other JTC workers who were not from the pre-release facility but who had criminal records were also refused base entry. JTC's President testified that JTC had not encountered similar access denials in its performance of other Malmstrom contracts over the nearly twenty years it had worked on the base.

Malmstrom's Chief of Security Forces Plans and Programs at the time, Michael Ward, stated in a 2012 declaration that JTC had been "essentially by-pass[ing] security procedures" at the base. J.A. 279, ¶ 6. Mr. Ward explained that JTC had been gaining base access for its bussed-in, pre-release facility workers by having a retired military member ride on the bus and vouch for everyone on it, which the base permitted at the time. Eventually, there was an incident on a Garco jobsite where a pre-release facility worker beat his manager with a wrench, and Mr. Ward later discovered that this worker had a violent criminal background.

In May 2007, JTC voiced concerns to Garco and the Air Force regarding the difficulty it experienced getting its workers onto the base, although it acknowledged that violent criminals and sex offenders should not be granted base access. Informal communications from the Air Force indicated that violent criminals and sex offenders would

continue to be denied base access. After numerous exchanges between the parties, the Base Commander Major General Sandra Finan[1]—who was ultimately responsible for base access—issued a memorandum on October 22, 2007, indicating:

> The 911 Dispatch Center will input all listed employees' name[s] and data into the National Criminal Information Center (NCIC) database for a *background check* in accordance with Air Force directives. *Unfavorable results from the background check will result in individuals being denied access to the installation, including,* but not limited to, individuals that are determined to fall into one or more of the following categories: *those having outstanding wants or warrants, sex offenders, violent offenders, those who are on probation, and those who are in a pre-release program.* The definition of sex offender and violent offender can be found at Montana Code Annotated § 46-23-502.

J.A. 151 (emphases added).

Two days after Maj. Gen. Finan issued her base access memorandum, JTC submitted a request for equitable adjustment ("REA") of the contract. JTC explained in the REA that its inability to use convict labor on the base greatly reduced the size of the experienced labor pool from which it could hire in the Great Falls, Montana, area. JTC claimed that, as a result, it incurred nearly half-a-million dollars ($454,266.44) of additional expenses from additional time interviewing and hiring new workers, paying overtime to new workers, and training new and

---

[1] Maj. Gen. Finan was the rank of Colonel at the time, but has since been elevated to Major General. This opinion refers to Maj. Gen. Finan by her elevated rank.

less experienced workers. Notably, the REA only requested additional money; it did not request a time extension.

The Air Force denied the REA, and JTC, through Garco, requested reconsideration by the contracting officer. Eventually the claim reached the Armed Services Board of Contract Appeals. The Board first granted partial summary judgment, "holding that [Maj. Gen.] Finan's 22 October 2007 base access memorandum was a sovereign act and the Air Force was not liable for damages from that date forward." *Appeals of—Garco Constr., Inc.*, ASBCA No. 57796, 15-1 B.C.A. (CCH) ¶ 36,135 (Sept. 22, 2015). In a later decision, the Board held that the base access policy in place at contract award in August 2006 was also a sovereign act, and moreover, was not changed by the October 2007 memorandum. The Board therefore rejected Garco's argument that prior to October 22, 2007, the Air Force could only deny access to workers who had outstanding "wants or warrants." Instead, the Board found that a "wants and warrants" check was synonymous with a background check and Maj. Gen. Finan's memorandum was simply a clarification of—not a change to—the base access policy, and therefore the Air Force was not liable for damages before the memorandum issued either. The Board also concluded that the Air Force's increased enforcement of the base access policy did not constitute a constructive acceleration of the contract, and that JTC could not recover under that theory.

Garco appeals the Board's decision, and we have jurisdiction under 28 U.S.C. § 1295(a)(10) and 41 U.S.C. § 7107(a)(1).

## DISCUSSION

On appeal, Garco raises two narrow issues, which we address in turn below: (1) that Maj. Gen. Finan's October 2007 memorandum changed the base access policy and the policy it allegedly supplanted did not authorize the

exclusion of workers with criminal records; and (2) that the Air Force's sovereign act of denying base entry to JTC's workers constituted a compensable constructive acceleration of the contract. Notably, Garco concedes that if we determine Maj. Gen. Finan's October memorandum did not change the base access policy, then their arguments fail. *See* Oral Arg. at 4:28–4:48, http://oralarguments.cafc.uscourts.gov/default.aspx?fl=20 16-1936.mp3. Garco does not challenge the Board's determination that the base access policy is a sovereign act. [2]

---

[2]    Because Garco does not challenge the Board's determination that the base access policy is a sovereign act, and in fact agrees that the Air Force had the right to limit base access, *see* Oral Arg. at 2:17–2:31, we do not address the doctrine generally. Moreover, we do not address the issues raised by the dissent because Garco "failed to argue that the government did not satisfy the 'impossibility' requirement of the sovereign acts defense, [and thus] it has waived that argument for purposes of appeal." *Conner Bros. Constr. Co. v. Geren*, 550 F.3d 1368, 1379 (Fed. Cir. 2008). We disagree with the dissent's contention that the sovereign acts doctrine is a jurisdictional defense that cannot be waived. Through the Contract Disputes Act, Congress waived the government's sovereign immunity in this case, establishing the court's jurisdiction. The sovereign acts doctrine, in contrast, has no effect on jurisdiction; it is, instead, an affirmative defense that serves only to prevent the United States from being "held *liable* for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign." *Horowitz v. United States*, 267 U.S. 458, 461 (1925) (emphasis added). Like other affirmative defenses ruled on by the Board, an appellant waives its right to challenge the Board's ruling by failing to raise the issue on appeal.

I.

Garco first asserts that the base access policy did not authorize the Air Force to prohibit workers with a criminal record from entering the base until Maj. Gen. Finan's October 2007 memorandum issued, and therefore JTC's request for equitable adjustment (or REA) should have been granted. As support, Garco turns to the language of the base access policy, particularly its reference to the NCIC "wants and warrants check" that the 911 dispatcher was to perform under the policy. Garco argues that this language is plain on its face and means that only a search for outstanding wants or warrants was to be performed. Garco argues that anything more, such as a search of a criminal record, falls outside the stated restrictions on access. Garco also directs us to a line from Maj. Gen. Finan's testimony where she stated that denying access from those with a violent background or in pre-release programs was a "large change" to the base access policy. Appellant Br. 37 (citing J.A. 299). As further support, Garco notes that Maj. Gen. Finan's October 2007 memorandum refers to a "background check," rather than a "wants and warrants check."

Addressing Garco's argument requires us to interpret the base access policy, an agency regulation. This is a legal issue which, under the Contract Disputes Act, 41 U.S.C. §§ 7101–09, we review de novo. *Gen. Dynamics Corp. v. Panetta*, 714 F.3d 1375, 1378 (Fed. Cir. 2013). However, "[t]he agency's construction of its own regulations is 'of controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Reizenstein v. Shinseki*, 583 F.3d 1331, 1335 (Fed. Cir. 2009) (quoting *Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*, 400 F.3d 1352, 1364 (Fed. Cir. 2005)); *see also Auer v. Robbins*, 519 U.S. 452, 461 (1997). Garco does not challenge this proposition, but instead argues that no deference is due when the agency's interpretation contradicts

the plain and sensible meaning of the regulation. *Roberto v. Dep't of the Navy*, 440 F.3d 1341, 1350 (Fed. Cir. 2006).

We disagree with Garco that the plain text of the base access policy unambiguously resolves the dispute. As when we construe statutory language, we must consider the regulation as a whole and the term "wants and warrants check" in the context in which it was used. *See Textron Lycoming Reciprocating Engine Div., Avco Corp. v. United Auto., Aerospace & Agric. Implement Workers of Am.*, 523 U.S. 653, 657 (1998) ("[I]t is a fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." (internal quotation marks omitted)); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."). While there may be some merit to Garco's argument that the plain meaning of "wants and warrants check" in isolation suggests a check only for wants or warrants, the surrounding language casts doubt on that interpretation.

For example, the sentence immediately following the disputed "wants and warrants check" language reads: "Unfavorable results will be scrutinized and eligibility will be determined on a case-by-case basis." J.A. 51. This directive for a case-by-case analysis of unfavorable results suggests that the check is more searching than a simple check for outstanding wants or warrants. Indeed, the government introduced testimony that anyone with a want or warrant would be immediately detained and would not be "scrutinized" with "eligibility . . . determined on a case-by-case basis." J.A. 25. Garco's explanation that this sentence could mean that the Air Force may grant base access to those with old, but still outstanding, warrants is not convincing. At bottom, we find that this

sentence cuts against Garco's plain meaning interpretation such that we must consider the Air Force's interpretation. *Reizenstein*, 583 F.3d at 1336–37 (considering agency interpretation of its own regulation when "the text of the regulation does not unambiguously answer the question" presented).

The Air Force interprets the base access policy as providing for a criminal background check. The Air Force presented significant evidence to support this interpretation. JTC's own statements and actions during the relevant timeframe support the Air Force's interpretation. Meeting minutes from a project meeting held around the time JTC executed the subcontract with Garco indicate that worker "names will be sent to dispatch for background checks. . . . No one with outstanding warrants, felony convictions, or on probation will be allowed on base." J.A. 270–71. The minutes directed the recipients to "review these minutes and respond within ten days in writing should any discrepancies or omissions be noted." J.A. 270. Neither JTC nor Garco contacted the Air Force about how the minutes characterized the base access policy. Further, when JTC first experienced base access issues with its workers, it specifically requested that certain workers be granted base access but "recognize[d] that this would not apply to sexual offenders or violent offenders." J.A. 281.

In addition to JTC's own statements and actions, the government presented testimony from Michael Ward, Chief of Security Forces Plans and Programs for the base at the time the dispute arose. Mr. Ward provided consistent testimony that a "NCIC wants and warrants check" is a term of art denoting a specific type of background check in the NCIC system, explaining that "[b]ackground check is a very generic term. Wants and warrants is what is titled out of the NCIC check that provides the data that is being reviewed." J.A. 316, l. 17 – 317, l. 2. He further explained that the NCIC wants and

warrants check includes a search for criminal background information:

> Q:   What is your understanding of a wants and warrants check?
>
> A:   *A wants and warrants check is the background check.*   Basically what it is, is it's the information that is loaded into the actual 9-1-1—or the NCIC system.   Probably the name, date of birth, Social Security Number, driver's license number, or a combination of that information would reveal the background, any wants or warrants, registration in the—*any formal programs such as sexual of-fender or violent offender programs and their criminal history would be listed as well.*

J.A. 306, ll. 5–20 (emphases added).   Mr. Ward also described an NCIC "wants and warrants check" and a "background check" as "synonymous."   J.A. 313, ll. 15–20. Finally, he explained that Maj. Gen. Finan's October 2007 memorandum was not a change to the base access policy. J.A. 315, ll. 16–19 ("Q: Was this list [of those banned from the base in the October 2007 memo] different than your understanding of Malmstrom's current policy described in the background paper?  A: No, sir, it was not.").

Maj. Gen. Finan's testimony supports the testimony of Mr. Ward.   During her testimony, Maj. Gen. Finan de-scribed an "unfavorable result," which the access policy instructs should be scrutinized, as "convictions, arrests, you know, drug use, sex abuse, domestic abuse, anything like that, that would come up on the background check." J.A. 295, l. 18 – 296, l. 5; *see also* J.A. 300, l. 8 – 301, l. 1. Garco makes much of Maj. Gen. Finan's testimony that barring those with a criminal record from entering the base was a "large change" to the access policy.  Appellant Br. 37 (quoting J.A. 153, l. 17).   But this testimony is less precise than Garco claims.    It is unclear whether Maj. Gen. Finan meant that her October 2007 memoran-

dum itself effected the change, or if the change was the institution of the base access policy her memorandum clarified. Indeed, only moments before mentioning the large change, Maj. Gen. Finan testified that allowing violent and sex offenders on the base would have been a "dramatic change" to the base access policy at the time she drafted her memorandum. J.A. 298, ll. 5–13; J.A. 284.

Ultimately, Maj. Gen. Finan's less-than-clear testimony about a "large change" in the access policy—which, under Garco's interpretation, is at odds with the rest of Maj. Gen. Finan's testimony—does not render the Air Force's interpretation of the access policy plainly erroneous. Neither does the fact that Maj. Gen. Finan used the term "background check" in her memorandum instead of the term "wants and warrants check" as used in the access policy. The purpose of Maj. Gen. Finan's memorandum was to clarify the base access policy, so it makes sense that she would use a different term than the one that was generating confusion.

Garco also argues that the Air Force's interpretation is flawed in light of the fact that the contract incorporated FAR § 52.222-3, which permits contractors to employ ex-felons. We disagree that the incorporation of this provision makes the Air Force's interpretation of the access policy inconsistent with the contract. For example, this provision could apply to JTC off-site employees who were not working on the base. Further, as Garco has acknowledged, the contract expressly required contractors to comply with the base access policy. And Garco does not dispute that Maj. Gen. Finan had the authority to ban ex-felons from entering the base. We therefore are not persuaded to draw the inference that Garco would have us draw from incorporation of the FAR provision.

After considering the ample support for the Air Force's interpretation, we conclude that the interpretation is not plainly erroneous or inconsistent with the regula-

tion, and we therefore must give it controlling weight. *See Reizenstein*, 583 F.3d at 1335. As a result, Maj. Gen. Finan's October 2007 memorandum was not a change to the base access policy, but rather clarifying guidance on the existing policy, and the Board properly denied JTC's REA on the basis of a changed base access policy.

## II.

Garco also argues that the Air Force's sovereign act effectuated a constructive acceleration of the contract. Although actions taken by the United States in its sovereign capacity shield the government from liability for financial claims resulting from those acts, the contractor may be allowed additional time to perform. *See Conner Bros.*, 550 F.3d at 1371, 1380 (affirming Board's ruling that the sovereign acts doctrine relieved the government of liability for damages but recognizing that the contractor received additional time to complete its project). Garco cites to a provision in the contract that allowed for delay in completing work if unforeseeable causes arose, including sovereign acts. Garco posits that by not allowing JTC to bring its more experienced workers on base, the Air Force compelled JTC to hire more workers, who had less experience and required training. Garco reasons that this additional hiring and training increased the time required to complete the work due under the contract.

This argument lacks merit. Our conclusion that the October 2007 memorandum was not a change to the base access policy significantly undermines Garco's assertion that there was an unforeseeable action that impacted JTC's work. But to the extent Garco argues that the unforeseeable action involved changes in the Air Force's enforcement of its base access policy, which JTC contends the Air Force had not fully enforced during JTC's past contracts on the base, we also disagree that such action

gives rise to constructive acceleration. The contract assigned the risk of adhering to Air Force regulations and orders to the contracting party. Thus, this risk must be borne by Garco.

In any event, Garco fails to make a prima facie case of constructive acceleration for an additional reason. Constructive acceleration typically requires a party to show both that it made a timely and sufficient request for a time extension and that its request was denied. *Fraser Constr. Co. v. United States*, 384 F.3d 1354, 1361 (Fed. Cir. 2004). JTC never formally requested a time extension, and the government, therefore, could not have denied JTC's non-existent request.

Citing John Cibinic & Ralph Nash, Administration of Government Contracts 451 (3d ed. 1995), Garco asserts that a formal request for additional time is not always required if the parties understand there to be a request for additional time. First of all, the Cibinic & Nash treatise Garco cites indicates that "many cases" require "that the contractor have actually submitted a request for time extension," which did not occur here. Cibinic & Nash at 451. Moreover, even if we were to accept Garco's legal position, it would not save Garco's constructive acceleration claim in this case. While JTC did submit an REA seeking additional money, there is no record evidence that any party interpreted that REA as also being a request for additional time. Further, while Cibinic & Nash cites a case from the Postal Service Board of Contract Appeals where an administrative judge held that a formal request is not always necessary when "there is a very clear indication from the contracting officer that no delay in the schedule will be tolerated," *id.*, such a "clear indication" did not occur here. For these reasons, we reject Garco's constructive acceleration claim.

CONCLUSION

We have considered Garco's remaining arguments and find them without merit. We affirm the decision of the Board denying Garco's claims for contract damages.

**AFFIRMED**

COSTS

Costs to Appellee.

# United States Court of Appeals for the Federal Circuit

---

**GARCO CONSTRUCTION, INC.,**
*Appellant*

**v.**

**SECRETARY OF THE ARMY,**
*Appellee*

---

2016-1936

---

Appeal from the Armed Services Board of Contract Appeals in Nos. 57796, 57888, Administrative Judge Craig S. Clarke.

---

WALLACH, *Circuit Judge*, dissenting.

The instant appeal is about the sovereign acts doctrine.[1] It hinges entirely on whether that doctrine, an

---

[1] The sovereign acts doctrine is part of the principle of sovereign immunity, i.e., "[a] government's immunity from being sued in its own courts without its consent." *Sovereign Immunity*, Black's Law Dictionary (10th ed. 2014). "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999) (internal quotation marks and citation omitted). The Contract Disputes Act of 1978, 41. U.S.C. §§ 7101–7109 (2012), is one such waiver of sovereign immunity, as it

affirmative defense, shields the U.S. Army Corps of Engineers, the U.S. Air Force, and the Secretary of the U.S. Department of the Army (collectively, "the Government") from liability for preventing James Talcott Construction, Inc.'s ("JTC") employees from accessing the Malmstrom Air Force Base ("Malmstrom") in Montana.[2] Nonetheless, the majority never applies the sovereign acts doctrine to the analysis of the case.

"Ordinarily, it is incumbent on the defendant to plead and prove [an affirmative] defense . . . ." *Taylor v. Sturgell*, 553 U.S. 880, 907 (2008) (citation omitted). Our precedent is clear that "[t]he [sovereign acts] doctrine is an affirmative defense that is an inherent part of every government contract." *Conner Bros. Constr. Co. v. Geren*, 550 F.3d 1368, 1371 (Fed. Cir. 2008) (citation omitted). The Armed Services Board of Contract Appeals ("ASBCA") found that the Government met its burden of proving entitlement to this affirmative defense, *see Garco Constr., Inc.* (*Garco III*), ASBCA Nos. 57796, 57888, 16-1 BCA ¶ 36,278 (J.A. 31–34); *Garco Constr., Inc.* (*Garco II*), ASBCA Nos. 57796, 57888, 15-1 BCA ¶ 36,135 (J.A. 4–

---

waives the [G]overnment's sovereign immunity for claims brought by prime contractors in privity of contract with the Government. *E.g.*, *Winter v. FloorPro, Inc.*, 570 F.3d 1367, 1371–72 (Fed. Cir. 2009). The sovereign acts doctrine is an affirmative defense to contract claims brought pursuant to this waiver of sovereign immunity, permitting the Government to reassert its sovereign immunity despite entering into privity of contract with a contractor. *See United States v. Winstar Corp.*, 518 U.S. 839, 860, 891–99 (1996) (plurality opinion) (discussing the sovereign acts doctrine as a defense to a breach of contract claim).

[2]    Appellant Garco Construction, Inc. ("Garco") hired JTC as a subcontractor.  J.A. 9.

28); *Garco Constr., Inc.* (*Garco I*), ASBCA Nos. 57796, 57888, 14-1 BCA ¶ 35,512 (J.A. 37–48), and the majority bypasses this determination under the guise of waiver in affirming the ASBCA, *see* Maj. Op. 6 n.2. However, because the sovereign acts doctrine is grounded in the Government's sovereign immunity, *see supra* n.1, I believe that finding waiver is inappropriate, *see Fed. Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 475 (1994) ("Sovereign immunity is jurisdictional in nature. Indeed, the terms of the [Government's] consent to be sued in any court define that court's jurisdiction to entertain suit." (internal quotation marks and citations omitted)); *City of Gainesville v. Brown-Crummer Inv. Co.*, 277 U.S. 54, 59 (1928) ("Of course a question of jurisdiction cannot be waived. Jurisdiction should affirmatively appear, and the question may be raised at any time." (citations omitted)).

The majority's conclusion suffers from two additional flaws. First, although the ASBCA correctly treated the sovereign acts doctrine as an absolute bar to finding the Government liable, *see, e.g.*, J.A. 28, 33, 47, it failed to consider whether the Government satisfied the second factor in the two-factor test for applying the doctrine. The majority compounds that error by ignoring the application of the doctrine altogether. Second, even though the ASBCA's conclusion that the sovereign acts doctrine applied would preclude a merits analysis and liability determination, the majority misinterprets the ASBCA's opinions below and incorrectly considers the merits. For these reasons, I respectfully dissent.

## I. The Sovereign Acts Doctrine

I begin by articulating the two-factor framework we apply to determine whether the Government is entitled to the affirmative defense of the sovereign acts doctrine. After articulating this framework, I turn to the ASBCA's analysis.

A. Legal Framework

The U.S. Supreme Court has not established the precise contours of the sovereign acts doctrine. Indeed, the Supreme Court has applied the sovereign acts doctrine in only two cases, the second of which produced a highly divided court without a majority opinion.

In *Horowitz v. United States*, the Supreme Court explained that the sovereign acts doctrine distinguishes between the Government's distinct roles as a private contractor and as a sovereign, providing that "the [Government] when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign." 267 U.S. 458, 461 (1925) (citations omitted). The Supreme Court did not address the doctrine again for the next seventy years. *See Winstar*, 518 U.S. at 923 (Scalia, J., concurring-in-the-judgment) (stating that the sovereign acts doctrine "has apparently been applied by th[e Supreme] Court in only a single case, our 3-page opinion in *Horowitz . . .*, decided in 1925").

In *Winstar*, Justice Souter authored a four- (and as to some portions, three-) Justice plurality opinion explaining that

> [t]he sovereign acts doctrine . . . balances the Government's need for freedom to legislate with its obligation to honor its contracts by asking whether the sovereign act is properly attributable to the Government as a contractor. If the answer is no, the Government's defense to liability depends on the answer to the further question, whether that act would otherwise release the Government from liability under ordinary principles of contract law.

*Id.* at 896 (plurality opinion) (footnote omitted). The Supreme Court has not revisited the sovereign acts doctrine since *Winstar*.

Lacking a definitive framework for applying the sovereign acts doctrine from existing Supreme Court precedent,[3] we have adopted the standard articulated by the plurality opinion in *Winstar*. *See, e.g.*, *Conner Bros.*, 550 F.3d at 1374 (stating that "this court has treated th[e plurality] opinion [in *Winstar*] as setting forth the core principles underlying the sovereign acts doctrine"). Pursuant to this framework, we evaluate the applicability of the sovereign acts doctrine using a two-factor test. *Klamath Irrigation Dist. v. United States*, 635 F.3d 505, 521 (Fed. Cir. 2011); *Stockton E. Water Dist. v. United States*, 583 F.3d 1344, 1366 (Fed. Cir. 2009). First, we ask whether the governmental act "is properly attributable to the Government as contractor" or to the Government as sovereign, i.e., whether the act was designed "to relieve the Government of its contract duties" or was a "genuinely public and general act that only incidentally falls upon the contract." *Stockton*, 583 F.3d at 1366 (internal quotation marks and citation omitted). Second, if the governmental act was a genuine public and general act, we ask "whether that act would otherwise release the Government from liability under ordinary principles of contract law." *Id.* (internal quotation marks and citation omitted).

As explained above, the sovereign acts doctrine "is an affirmative defense that is an inherent part of every government contract." *Conner Bros.*, 550 F.3d at 1371 (citation omitted). As an affirmative defense, the Government, as defendant, bears the burden of establishing its entitlement to the sovereign acts defense. *See Taylor*, 553 U.S. at 907. This burden applies to both factors of

---

[3] It does not appear that our sibling circuits have elaborated substantively on the guideposts provided by *Winstar*. *See, e.g.*, *Biodiversity Assocs. v. Cables*, 357 F.3d 1152, 1172 n.10 (10th Cir. 2004) (discussing *Winstar*).

our two-factor framework. *See Klamath*, 635 F.3d at 521−22 (stating that "the [G]overnment has the burden of establishing" all elements of the sovereign acts defense). Determining whether the Government has met its burden is a legal conclusion based on underlying factual findings reviewed for substantial evidence. *Conner Bros.*, 550 F.3d at 1378; *see* 41 U.S.C. § 7107(b)(2) (stating that the ASBCA's "decision . . . on a question of fact . . . may not be set aside unless the decision is," inter alia, "not supported by substantial evidence").

## B. The ASBCA Erred in Determining That the Sovereign Acts Doctrine Shielded the Government from Liability

The majority does not articulate or address the test concerning the sovereign acts doctrine. *See generally* Maj. Op. Because I believe both the ASBCA and this court are bound by the two-factor framework articulated above, I evaluate whether the Government satisfied its burden as to each factor. In my opinion, it did not.

### 1. Substantial Evidence Supports the ASBCA's Finding That the Government's Acts Were Public and General Acts

The first factor, i.e., "whether the sovereign act is properly attributable to the Government as contractor," is a subjective inquiry that examines the purpose of the governmental act. *See, e.g.*, *Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569, 1573, 1575 (Fed. Cir. 1997) (stating that the parties' "characterization [of the governmental act] frames the dispositive issue" and then evaluating whether the Government was "acting for the purpose of" increasing prices charged to plaintiffs or solving problems related to uranium enrichment). We evaluate whether the act was "genuinely public and general" or "specifically directed at nullifying contract rights." *Stockton*, 583 F.3d at 1366, 1367 (internal quotation marks and citation omitted); *see Conner Bros.*, 550 F.3d at 1374 (similar). This inquiry can be informed by

"whether the governmental act[] applies exclusively to the contractor or more broadly to include other parties not in a contractual relationship with the [G]overnment." *Conner Bros.*, 550 F.3d at 1375.

The dispute here concerns the Government's decision to deny JTC's employees access to Malmstrom. Although JTC had not encountered difficulty obtaining base access for its employees for prior contracts at Malmstrom, the Government began denying access to JTC employees with criminal records soon after JTC commenced performance of the contract at issue here, forcing JTC to hire a less experienced work force and increasing JTC's cost of performance. J.A. 10–12. The ASBCA determined that the denial of access to JTC's employees pursuant to three documents—the July 21, 2005 341st Space Wing Pamphlet 31-103 ("the 31-103 Pamphlet") (J.A. 49–54), the July 26, 2005 341st Space Wing Instruction 31-101 ("the 31-101 Instruction") (J.A. 55–76), and the October 2007 base access memorandum ("the October 2007 Memorandum") (J.A. 144–46)—constituted sovereign acts that shielded the Government from liability.[4] J.A. 22–24, 46. In support, the ASBCA noted that each of these documents applies "to all contractors and contractor personnel" and that "[t]here is no evidence that the policy was intended to nullify contract rights or that it provided to the [G]overnment an economic advantage." J.A. 24, 46; *see* J.A. 24–25 (evaluating the October 2007 Memorandum), 46–47 (evaluating the 31-103 Pamphlet and 31-101 Instruction).

---

[4]   Garco does not contest the ASBCA's finding that denying base access pursuant to the October 2007 Memorandum was a sovereign act but, instead, contends that the Government is liable for the delays caused by the denial of base access to JTC prior to October 2007. Appellant's Br. 11.

Substantial evidence supports the ASBCA's factual findings that the Government's base access policy was a public and general act.  It is true that there is ample evidence that the Government's base access policies were subject to the "whim[s]" of the Wing Commander. J.A. 173; *see* J.A. 119 (stating that, over twenty years and dozens of projects, no JTC employees had been denied access prior to the contract at issue here), 153 (stating that the October 2007 Memorandum was a "large change"), 173 ("Good luck on this one, the policy appears to be undefined and pretty hard to defend.").  However, the relevant provisions in both the 31-103 Pamphlet and the 31-101 Instruction applied to "contractors" generally rather than specifically to Garco or JTC, J.A. 51, 71; *see* J.A. 49 (setting forth the "policy for contractors who require[] entry" to Malmstrom), and the October 2007 Memorandum was addressed to "*all* contractors and contractor personnel," J.A. 145 (emphasis added) (capitalization omitted).  In addition, the record is replete with evidence indicating that the purpose of the base access policy was to ensure Malmstrom's security.  *See, e.g.*, J.A. 284 (assessing the security impacts of three separate base access policies), 287 ("The purpose of [a National Crime Information Center] check i[s] to determine if there is any unfavorable information which may be detrimental to the security of the installation and preservation of good order and discipline on the installation.").  Finally, Garco has not identified any evidence either below or before this court that demonstrates that the 31-103 Pamphlet, the 31-101 Instruction, or the October 2007 Memorandum were directed at nullifying Garco's or JTC's contract rights.  J.A. 24 ("There is no evidence that the policy [articulated in, inter alia, the 31-103 Pamphlet or 31-101 Instruction] was intended to nullify contract rights or that it provided to the [G]overnment an economic advantage."), 46 ("[Garco] presents no evidence contradicting [Major General] Finan's declaration" as to the general purpose of the policy.); *see generally* Appellant's Br.  Thus, I agree

with the ASBCA that the Government's denial of access to Malmstrom was a public and general act.

## 2. Substantial Evidence Does Not Support the ASBCA's Finding That the Government's Acts Would Release It from Liability

Because I would find that substantial evidence supports the ASBCA's determination that the Government's denial of access to Malmstrom was a public and general act, I believe we must consider the second factor of the test, i.e., "whether that act would otherwise release the Government from liability under ordinary principles of contract law." *Stockton*, 583 F.3d at 1366 (internal quotation marks and citation omitted). "This second [factor] turns on what is known in contract law as the 'impossibility' (sometimes 'impracticability') defense." *Id.* To establish this defense, the Government must show that both full performance and substantial performance of the contract by the Government are "impossible." *Winstar*, 518 U.S. at 905; *Carabetta Enters., Inc. v. United States*, 482 F.3d 1360, 1365 (Fed. Cir. 2007). To make this showing, the Government must demonstrate that the event "rendering its performance impossible was an event contrary to the basic assumptions on which the parties agreed[] and . . . that the language or circumstances do not indicate that the Government should be liable in any case." *Winstar*, 518 U.S. at 904; *see* 12 No. 7 Nash & Cibinic Rep. ¶ 37 ("The determination of whether the nonoccurence of a specific sovereign act was a basic assumption of the contract will depend on the nature of the act and the circumstances surrounding the formation of the contract as well as its terms."). If the Government does not carry its burden of showing impossibility, then its invocation of the sovereign acts defense fails. *See Klamath*, 635 F.3d at 522 (stating that the trial court "erred in holding that impossibility of performance is not a factor to be taken into account in considering the sovereign acts doctrine").

The ASBCA neither made any findings as to impossibility nor referenced it at all, *see* J.A. 4–28, 31–34, 37–48, and nothing in the record indicates that the Government raised impossibility before the ASBCA. On appeal, the Government does not argue impossibility or provide evidentiary support for a finding of impossibility. *See generally* Appellee's Br. Indeed, neither "impossibility" nor its variants appear in the parties' briefs or in the Joint Appendix. *See generally* Appellant's Br.; Appellee's Br.; Appellant's Reply; J.A.

Where the ASBCA has failed to make factual findings as to impossibility in prior cases, we have reached three different results. In one instance, we vacated and remanded for additional fact finding "so that the [G]overment [would] have the opportunity to carry [its] burden" of "establishing that performance of the various contracts at issue was impossible." *Klamath*, 635 F.3d at 522 (footnote omitted). In another, we reversed and remanded the trial court's application of the sovereign acts doctrine because "[t]he [G]overnment c[ould ]not avail itself of the impossibility defense to save it from this breach of contract claim." *City Line Joint Venture v. United States*, 503 F.3d 1319, 1323 (Fed. Cir. 2007). Finally, in a third, we found that the plaintiff waived its arguments as to impossibility by failing to raise them before the ASBCA and affirmed the ASBCA's application of the sovereign act defense. *See Conner Bros.*, 550 F.3d at 1379.

I would find vacating and remanding to be the most appropriate result here.[5] *See Fla. Power & Light Co. v.*

---

[5]   "[W]e retain case-by-case discretion over whether to apply waiver . . . ." *Xianli Zhang v. United States*, 640 F.3d 1358, 1371 (Fed. Cir. 2011) (citation and footnote omitted). Unlike the majority, Maj. Op. 6 n.2, I would

*Lorion*, 470 U.S. 729, 744 (1985) ("[I]f the agency has not considered all relevant factors, . . . the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. The reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry."). "Appellate courts do not make factual findings; they review them." *Mittal Steel Point Lisas Ltd. v. United States*, 542 F.3d 867, 875 (Fed. Cir. 2008). Because the ASBCA did not make any factual findings as to impossibility, I believe that it is inappropriate for us to do so in its stead. When both the ASBCA and the Government have failed to address one of the requisite factors, I believe the proper course is to vacate and remand "so that the [G]overment may have the opportunity to carry [its] burden" of "establishing that performance . . . was impossible." *Klamath*, 635 F.3d at 522 (footnote omitted).[6]  Therefore, I would

---

decline to find waiver here for two reasons.  First, the sovereign acts doctrine is grounded in the Government's sovereign immunity, shielding the Government from liability for its actions as a sovereign.  *See supra* n.1; *Horowitz*, 267 U.S. at 461.  Therefore, I believe questions regarding the doctrine's application cannot be waived. *See, e.g.*, *Meyer*, 510 U.S. at 475; *Brown-Crummer*, 277 U.S. at 59.  Second, the Government did not meet its burden of establishing impossibility in this case and, thus, did not meet its burden of establishing the sovereign act defense.  Because the Government had not met its burden of establishing each factor of the sovereign act defense, Garco was under no obligation to rebut the Government's position on impossibility.  *See Klamath*, 635 F.3d at 522 n.14.

[6]  This course aligns with our practice in other administrative proceedings.  *See, e.g.*, *In re NuVasive, Inc.*,

vacate the ASBCA's opinions and remand for additional fact finding and explanation as to the impossibility factor's applicability.[7]

II. The Majority Misinterprets the ASBCA's Conclusions

In addition to failing to consider the sovereign acts doctrine and progressing directly to the merits, the majority further errs by misinterpreting the ASBCA's conclusions as being directed to the merits. The majority characterizes the ASBCA's opinions as concerning a matter of regulatory interpretation, i.e., interpreting the base access policy at Malmstrom. Maj. Op. 7–12. I believe that this characterization is inaccurate.

In each of its three opinions, the ASBCA determined that the Government is not liable because the sovereign acts doctrine shields it from liability. In *Garco I*, the ASBCA determined that "[t]he implementation of the

---

842 F.3d 1376, 1382, 1385 (Fed. Cir. 2016) (vacating and remanding so that an agency could fulfill its obligation to "make the necessary findings and have an adequate evidentiary basis for its findings" and to "articulate a satisfactory explanation for its action" (internal quotation marks and citations omitted)).

[7]    Having determined that the sovereign acts doctrine shielded the Government from liability, the ASBCA additionally found that constructive acceleration "does not provide [Garco] a path to entitlement to monetary damages resulting directly from the sovereign act of limiting access to" Malmstrom. J.A. 27; *see* J.A. 33 (affirming that conclusion on reconsideration). If the Government were to fail on remand to carry its burden as to impossibility of the sovereign acts doctrine, the ASBCA should reconsider Garco's claim for constructive acceleration, as well as any other liability theory that the Government previously advanced before the ASBCA.

base access policy by the October 2007 [M]emorandum was a sovereign act and the [G]overnment is not liable in damages that may have been caused from October 2007 forward." J.A. 46–47. In *Garco II*, the ASBCA determined that: "JTC presented ample credible evidence that it was harmed by the . . . change in . . . enforcement of [the] base access policy"; "JTC was not able to hire as experienced a work force as it had in the past"; and "this had an adverse impact on JTC's labor hours and associated costs of performance." J.A. 21, 21–22. On these bases, the ASBCA determined that the Government "*could be liable* for this damage *unless* it is protected by the sovereign act defense." J.A. 22 (emphases added) (footnote omitted). Nonetheless, the ASBCA "extend[ed] the sovereign act protection" from *Garco I* "back to the spring of 2007 or whenever the [Government] first started denying access" to JTC's employees. J.A. 27; *see* J.A. 28 ("Conclusion" section of the opinion stating in its entirety: "The [Government]'s enforcement of its base access policy commencing on or about the spring of 2007 *was a sovereign act*. To the extent JTC suffered as a result of the denial of access to its desired workers, the [Government] *is not liable* in monetary damages. The appeals are denied." (emphases added)). Finally, in *Garco III*, the ASBCA denied Garco's request for reconsideration of *Garco II*. J.A. 33. In so doing, the ASBCA stated in its penultimate sentence that "[w]e are unwilling to establish a new limit on the breadth of the sovereign act doctrine." J.A. 33 (footnote omitted).

It is evident from each of these three decisions that the foundation of the ASBCA's conclusions is that the sovereign acts doctrine shields the Government from monetary liability. Considered in the context of the ASBCA's full opinions, the ASBCA's discussion of the October 2007 Memorandum's text and the parties' other arguments is part of its analysis of whether the sovereign acts doctrine applies to the Government's acts prior to

October 2007.  Indeed, the very section of *Garco II* that the majority cites (*see* Maj. Op. 8) is entitled "JTC's Interpretation Argument/Scope of the Sovereign Acts," and this section concludes by stating "[w]e have already held that th[e National Crime Information Center check] process is embodied in documents that *qualify for sovereign act protection*." J.A. 24 (italics omitted), 25 (emphasis added).

Instead of acknowledging the context in which the ASBCA made its findings, the majority engages in an analysis of the merits.  The ASBCA did not decide against Garco on the merits.  In fact, the ASBCA expressly acknowledged that the Government "could be liable" on the merits but for the sovereign acts doctrine.  J.A. 22 (footnote omitted).  The ASBCA determined that its sovereign acts analysis in *Garco I* applied equally to the Government's acts both before and after the issuance of the October 2007 Memorandum.  But, as explained above, the ASBCA's analyses as to pre- and post-October 2007 governmental acts are equally deficient—neither addresses impossibility.  It is unclear why the majority undertakes an analysis of merits when (1) it is unknown at this time whether the Government properly pleaded the affirmative defense and (2) the ASBCA did not consider the merits.  *See Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below.").

Finally, the majority's analytic framework produces more questions than answers.  For example, if the majority reached a different conclusion on the merits—i.e., if it found that the Government's interpretation was erroneous and that the October 2007 Memorandum was a change in base access policy—Garco still could not recover damages.  Recovery would require consideration and reversal of the ASBCA's application of the sovereign acts doctrine, the very threshold issue that the majority bypasses here.  *See Horowitz*, 267 U.S. at 461 (stating that

the Government "cannot be held liable" when the sovereign acts doctrine applies (citations omitted)). Because the approach employed by the majority sows confusion and does not comport with what precedent demands, I decline to follow it.

### III. Conclusion

The sovereign acts doctrine was the sole issue decided below. Yet, this threshold inquiry is entirely absent from the majority's analysis, which focuses on the merits. Maj. Op. 7–13. However, affirming the ASBCA's finding that the sovereign acts doctrine applies here precludes a finding that the Government is liable, rendering this analysis superfluous. I believe that the more appropriate course is to follow our clear precedent that the sovereign acts doctrine is an affirmative defense for which the Government bears the burden as to both factors. Because the Government did not satisfy its burden as to the second factor, I would vacate the ASBCA's opinions and remand with instructions to consider the second factor.